## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NEXT STEP RECOVERY HOME, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00353-TWP-MKK |
| | ) | |
| STATE OF INDIANA, | ) | |
| EXECUTIVE DIRECTOR, INDIANA | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |

### ENTRY GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This matter is before the Court on a Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 filed by Plaintiff Next Step Recovery Home, Inc. ("Next Step") (Filing No. 8).  Next Step alleges that Defendants the State of Indiana (the "State"), and the Executive Director, Indiana Department of Homeland Security ("DHS"), are unlawfully classifying Next Step's group recovery home as a Class 1 structure in violation of the Fair Housing Amendments Act, 42 U.S.C. § 3604(f) ("FHAA"), the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA").  Next Step moves to enjoin Defendants from classifying the home as a Class 1 structure.  On July 30, 2024, the Court conducted a hearing on the Motion.  For the following reasons, the Court **grants** preliminary injunctive relief.

## I.    BACKGROUND

### A.    Next Step's Group Recovery Home

Next Step is a non-profit organization whose purpose is to provide therapeutic housing to men in the Dubois County, Indiana, area who are recovering from substance abuse and addiction disorders (Filing No. 32-1 ¶ 5).  To that end, Next Step purchased a three-bedroom, two-bathroom

home with a finished basement in Jasper, Indiana (the "Home"). *Id.* ¶¶ 15–16, 43.  The Home was used as a single-family home by its prior owner and is indistinguishable in design, architecture, and appearance from the other homes in the neighborhood. *Id.* ¶¶ 18, 41.  The Home satisfies the local zoning standards imposed on nearby residences and complies with all local land-use regulations. *Id.* ¶ 35.  Next Step has also installed a monitored security system that includes a fire safety system, cameras, smoke alarms, and carbon monoxide detectors. *Id.* ¶¶ 38–39.  Residents of the Home are instructed on what to do in case of fires and participate in regular fire drills. *Id.* ¶ 40.

The Home will house six to eight men recovering from alcohol and/or drug addiction while they maintain their sobriety and receive outside treatment. *Id.* ¶ 63.  It is to be used by men who are not yet able to live independently without relapsing and who have problems associated with recovery from substance abuse disorders. *Id.* ¶¶ 5–7, 10–11.  As persons recovering from substance abuse, these men are not able to adequately care for themselves and have difficulty in basic life functions like concentrating, thinking, communicating, interacting with others, parenting, and working. *Id.* ¶ 11.

After purchasing the Home, Next Step entered into a contract with Behind the Wire Ministries, Inc. ("Behind the Wire"), a non-profit organization that provides treatment and residential care to people with histories of drug and alcohol abuse and addiction. *Id.* ¶ 19.  Participants undergo the initial phase of treatment at Behind the Wire's campus in Loogootee, Indiana. *Id.* ¶ 20.  Participants are then either placed in a home owned by Behind the Wire in Loogootee or in the Next Step Home in Jasper. *Id.*  Behind the Wire's formal programming is designed to be completed in a minimum of nine months, but after nine months, a person can remain in the program and continue receiving treatment if he cannot yet live on his own because of the

risk of relapse. *Id.* ¶ 22. A person can stay in the Home for up to two years, or possibly longer, if he still cannot live independently without relapsing. *Id.* ¶ 23. After completing the initial phase of treatment in Loogootee, residents are expected to obtain employment and pay a weekly fee of two hundred and eight dollars for housing, food, and treatment. *Id.* ¶¶ 30–31.

Next Step intends that the Home's residents will live with others in recovery, and that the Home will provide them a place to live as a supportive family, receive treatment, and learn to live functional lives without relapsing. *Id.* ¶ 7. It is key to residents' treatment that they live together as a family. *Id.* ¶ 8. They will share not only a Home, but also chores, meals, and relaxation time, like any nuclear family would. *Id.* ¶ 9. Next Step anticipates that residents will share bedrooms, and there are no spaces in the Home that are in the possession of a single person. *Id.* ¶ 33. The common spaces, for instance, are shared by all residents. *Id.* ¶ 34. No staff members live in the Home, but staff from Behind the Wire regularly go to the Home to check on the residents and assist them with the use, enjoyment, and management of the property. *Id.* ¶ 25. The residents are primarily responsible for the care and day-to-day operations of the Home. *Id.* ¶ 26. Although the Home's residents do not sign leases, they sign agreements to abide by certain rules, including rules against drug and alcohol use. *Id.* ¶¶ 27, 29. Residents are subject to removal from the Home if they violate those rules. *Id.* ¶ 28.

In November 2023, shortly after Next Step announced it was opening the Home, it was contacted by DHS inspector Seth Eckstein ("Mr. Eckstein"). *Id.* ¶¶ 44–45. Mr. Eckstein asked to inspect the Home, and Next Step agreed. *Id.* ¶ 46. At the time, there were no residents in the Home, and Mr. Eckstein did not ask about the nature of prospective residents or the programming they would receive. *Id.* ¶ 47. After his inspection, Mr. Eckstein indicated that the Home did not

meet "Class 1" safety standards and would be shut down if it housed more than two men.  *Id.*
¶¶ 48–49.

Mr. Eckstein indicated that he thought Next Step would need to install a sprinkler system
before placing more than two men in the Home.  *Id.* ¶ 50.  Next Step consulted with a local
company, which estimated that a sprinkler system would cost $100,000.00.  *Id.* ¶ 55.  Next Step
also contacted a design engineer who stated that Next Step could avoid a sprinkler system by
accruing "points" based on other safety features in the Home, but it would cost more than
$100,000.00 to make the changes needed to accrue enough "points."  *Id.* ¶¶ 53, 55.  Mr. Eckstein
mentioned the possibility of a variance from some Class 1 requirements, but he could not guarantee
that a variance would be approved.  *Id.* ¶ 56.  In addition to sprinkler systems, Class 1 structures
must also obtain DHS's approval for any future improvements.  Next Step cannot afford a
commercial sprinkler system, the safety features needed to accrue safety "points," or the costs
associated with obtaining approval for future improvements.  Next Step needs the money it has on
hand to operate the Home and to save up for another recovery home in Dubois County.  *Id.* ¶¶ 57–
58.

Only two men currently live the Home, since Next Step cannot afford to make the Home
compliant with Class 1 standards.  *Id.* ¶ 60.  There are more men recovering from addiction who
would be placed in the Home were it not for DHS's threat of a shutdown.  *Id.* ¶¶ 63–64.

**B.**     **Indiana Zoning Laws**

Indiana law divides structures into two classes: Class 1 and Class 2.  Ind. Code §§ 22-12-
1-4 and -5.  Class 1 is the more commercial of the two classes and is typically subject to heightened
construction standards (Filing No. 32-2 at 108, Ex. 6).  Indiana Code § 22-12-1-4 classifies a
structure as Class 1 if any part of the structure is intended to be used or occupied by any of the
following: (1) the public; (2) three or more tenants; or (3) one or more persons who act as

employees of another.  The Indiana Code does not define "tenant".  Under Indiana Code § 22-12-1-5, a Class 2 structure is one intended to contain only one or two dwelling units, unless any part of the structure is regularly used as a Class 1 structure.

**C.**    ***New Horizons Rehabilitation v. State***

Next Steps contends that this case is essentially a repeat of *New Horizons Rehabilitation, Inc. v. State*, No. 4:17-cv-49-TWP-DML (S.D. Ind.), so a brief discussion of that case is warranted. The plaintiff in *New Horizons*, like Next Step, was a non-profit organization that ran group homes for adults with disabilities.  400 F. Supp. 3d 751, 755 (S.D. Ind. 2019).  The New Horizons homes all looked and functioned like single-family dwellings.   In 2013, New Horizons was donated property in Lawrenceburg, Indiana, on which to build a group home for adults with intellectual and developmental disabilities.  New Horizons was told that its proposed home was a Class 1 structure, so the plans for the home needed to be reviewed and approved by DHS.  After reviewing the plans, DHS stated that the home would need to include a commercial sprinkler system, which was estimated to cost between six and twelve thousand dollars.  New Horizons requested a variance from the sprinkler requirement, but that request was denied.

In March 2017, New Horizons filed a complaint for declaratory and injunctive relief, arguing that the decision to classify the group home as a Class 1 structure violated the Equal Protection Clause, FHAA, ADA, and Rehabilitation Act.  New Horizons sought an injunction enjoining DHS from classifying the planned group home as a Class 1 structure.  *Id.*  In October 2017, the Court issued a preliminary injunction, finding that New Horizons had shown a reasonable likelihood of success on all of its claims and the balance of harms and public interest weighed in favor of an injunction.  No. 17-cv-49, 2017 WL 4865912 (S.D. Ind. Oct. 27, 2017).

In July 2019, the Court issued its summary judgment decision, in which the Court concluded that Indiana's zoning scheme was facially neutral, but Defendants were not applying the zoning statutes consistently:

> New Horizons makes the argument that the statute is not applied consistently because family homes with three or more foster children are Class 2 structures but its proposed supported living facility for three intellectually or developmentally disabled adults is treated as a Class 1 structure. The Defendants['] response that it simply does not consider foster children to be "tenants" under the statute is misguided. They essentially admit what New Horizons alleges—that DHS treats intellectually and developmentally disabled persons differently from others without any justification. DHS did not provide a definition of the word 'tenant' that it applies systematically, which includes foster children but not New Horizons' clients. Nor do Ind. Code §§ 22-12-1-4 or -5 define the word "tenant."

400 F. Supp. 3d at 768.  The Court granted summary judgment in favor of New Horizons on its disparate treatment and a failure to accommodate claims, but not its Equal Protection claim.  The Court entered a permanent injunction enjoining Defendants "from treating New Horizons' Lawrenceburg, Indiana home as a Class 1 structure or imposing on it any of the costs or burdens associated with Class 1 structures." *Id.* at 770.

### D.    DHS's Subsequent Zoning Law Interpretations

In March 2020, less than a year after *New Horizons*, DHS issued a public notice (the "Notice") regarding the "Classification of Supportive Living Facilities." (Filing No. 30-1.)  The Notice was intended "[t]o address the overlap between the definitions of Class 1 and Class 2 structures" and "clarify when supportive living facilities (facilities that provide staff to its residents to assist with daily living activities) are considered Class 1 or Class 2 Structures." (Filing No. 30-1; *see* Filing No. 30 ¶ 56.)  The Notice provides, in part:

> A tenant is someone, or some group that either: (1) has possession of a unique portion of a structure; or (2) occupies a structure on unique or independent terms from other occupants. The overarching concern is whether the person or persons occupying, or intending to occupy, the structure or portion of the structure, are doing so independently or as a single occupant.

6

(Filing No. 31-1).  The Notice does not explain the basis for DHS's new definition of "tenant".

DHS republished the Notice in April 2021, contemporaneously with a Written Interpretation of the

State Building Commissioner, which adopted the same definition of "tenant".

**E.    Procedural History**

Next Step initiated this action in February 2024 by filing its Complaint for Declaratory and

Injunctive Relief (Filing No. 1).    The next month, Next Step filed the instant Motion for

Preliminary Injunction (Filing No. 8).  Next Step then filed its Amended Complaint, which is now

the operative pleading (Filing No. 30). On July 1, 2024, Defendants filed their response to the

Motion for Preliminary Injunction (Filing No. 40), and on July 16, 2024, Next Step filed its reply

(Filing No. 45).  The Court heard oral argument on the Motion on July 30, 2024.  The Motion is

now ripe for the Court's review.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Granting a preliminary injunction is "an

exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding

it."  *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and

quotation marks omitted). When a district court considers whether to issue a preliminary

injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has a reasonable likelihood of success on the merits of its claim; (2) no
> adequate remedy at law exists; (3) it will suffer irreparable harm if preliminary
> injunctive relief is denied; (4) the irreparable harm it will suffer without preliminary
> injunctive relief outweighs the irreparable harm the nonmoving party will suffer if
> the preliminary injunction is granted; and (5) the preliminary injunction will not
> harm the public interest.

*Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).  The

greater the likelihood of success, the less harm the moving party needs to show to obtain an

injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

## III.    DISCUSSION

Next Step alleges that Defendants' classification of the Home as a Class 1 structure is discriminatory, and that Defendants have failed to provide a reasonable accommodation by refusing to treat the Home as a Class 2 structure. The Court will first address whether Next Step has a reasonable likelihood of success on the merits of its claims, then whether Next Step has an adequate remedy at law and whether the balance of irreparable harms favors an injunction, and finally whether an injunction would serve the public interest.

## A.    Reasonable Likelihood of Success on the Merits

Next Step asserts claims for disparate treatment and failure to accommodate under the ADA, FHAA, and Rehabilitation Act. The Court will discuss each claim in turn.

### 1.    Disparate Treatment

Disparate treatment under the ADA, FHAA, and Rehabilitation Act "involves a showing of intentional discrimination, provable via either direct or circumstantial evidence." *Nikolich v. Vill. of Arlington Heights*, 870 F. Supp. 2d 556, 562 (N.D. Ill. 2012); *see Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995) (Rehabilitation Act); *Kormoczy v. Sec'y., U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823 (7th Cir. 1995) (Fair Housing Act); *Smith v. Hous. Auth. of S. Bend*, 867 F. Supp. 2d 1004, 1016 (N.D. Ind. 2012) (ADA). In *New Horizons*, the Court held that Defendants were discriminating against people with disabilities by using Indiana's facially neutral zoning scheme as a "proxy to evade prohibition of intentional discrimination." 400 F. Supp. 3d at 768.

Next Step contends that Defendants are engaging in the same discriminatory conduct and simply using new a new proxy—namely, the Notice's new definition of "tenant"—so Next Step is very likely to succeed on the merits of its claims (Filing No. 32 at 24). DHS responds that Next

Step is not likely to succeed because:  Next Step has not shown that its residents are "disabled"; the residents are "tenants" as defined in the facially neutral Notice; and *New Horizons* is distinguishable.  The Court will address each of DHS's arguments in turn.

### a.  <u>Disability of Residents</u>

Next Step asserts that the Home's current and future residents all have addiction impairments that substantially limit one or more major life activity, including concentrating, thinking, communicating, interacting with others, parenting, and working ([Filing No. 33 at 21](#)). The residents cannot live independently due to these impairments and the risk of relapse.  *Id.*  Next Step cites several cases in which courts have recognized that people residing in sober-living group housing with similar limitations are disabled.  *Reg'l Econ. Cmty. Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002); *Oxford House v. Browning*, 266 F. Supp. 3d 896, 910–11 (M.D. La. 2017); *Mary's House, Inc. v. North Carolina*, 976 F. Supp. 2d 691, 702 (M.D.N.C. 2013); *Oxford House, Inc. v. City of Baton Rouge*, 932 F. Supp. 2d 683, 689 (M.D. La. 2013).

Defendants respond that the Home's residents are not disabled because they can perform all major live activities without assistance, they are expected to maintain full-time jobs, and they are permitted to leave the home unsupervised on the weekends ([Filing No. 40 at 11](#)).  On reply, Next Step notes that people with disabilities are often able to maintain full-time employment, so the fact that residents are expected to work does not show they are not disabled ([Filing No. 45 at 2](#)–3).  Next Step further argues that the terms "disability" and "substantially limits" are to be construed broadly, and reiterates that federal courts have regularly held that persons who cannot live independently without relapsing are substantially impaired.  *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 338–39 (6th Cir. 2002); *United States v. Borough of Audubon*, 797 F. Supp. 353, 359 (D.N.J. 1991), *aff'd*, 968 F.2d 14 (3d Cir. 1992) (unpublished); *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 804 (9th Cir. 1994).

Although addiction is not a *per se* disability, the Home's residents are and will be limited to men with addiction disorders so severe that they substantially limit one or more life activity, and thus *are* disabilities. The designated evidence offered by Next Step shows that the Home's two current residents, for example, have difficulty in concentrating, thinking, communicating, interacting with others, parenting, and working, and they need several types of assistance to learn how to lead independent, sober lives (Filing No. 40-3 at 63:11–17, 101:20–24, 102:8–23). Far from living independently, the current residents are provided continuous oversight and supervision and are subjected to various rules and random drug screens to prevent them from relapsing. And as Defendants note, once residents have completed treatment and are able to live independently without the risk of relapse, they must move out, ensuring that the Home only ever houses people with disabilities (Filing No. 40 at 13). The Court concludes that Next Step has shown that the Home's current and intended residents have disabilities.

### b.  DHS's Definition of "Tenant"

Defendants next argue that "Next Step's group home arrangement simply does not meet the statutory definition of a Class 2 structure" because it plans to House more than three "tenants," so Next Step cannot show that the Home's Class 1 status is discriminatory. Indiana law does not define "tenant," but following *New Horizons*, DHS began defining that term to mean any person or group that "has possession of a unique portion of a structure" or "occupies a structure on unique or independent terms from other occupants" (Filing No. 40 at 11; Filing No. 30-1). DHS contends that this definition in the Notice is non-discriminatory and is used to consistently apply Indiana zoning laws. Next Step contends that DHS's new definition of "tenant" is convoluted and evolving, and the Notice is "simply a declaration, despite *New Horizons*, that group homes for persons with disabilities are Class 1 structures." (Filing No. 33 at 26.) Next Step adds that Defendants' "tortured

attempts" to "explain the difference between a Class 1 and Class 2 structure makes the discrimination even more obvious." *Id.* at 25.  The Court agrees with Next Step.

The Notice does not define "unique portion" or "unique or independent terms," and its focus on whether an occupant is occupying the structure "independently or as a single occupant" is circular and thus unhelpful (Filing No. 30-1).  At oral argument, defense counsel was asked to define "unique possession" and "unique or independent terms," but instead of defining those terms, he offered two examples: a nuclear family would be a "single tenant" because the parents would know and control when their children are coming and going; but apartment residents would each be individual tenants because they do not control the other tenants.  These examples do not clarify how DHS is distinguishing between tenants and non-tenants.  They only raise more questions about DHS's application of Indiana's zoning laws.  Does DHS now consider *all* structures to have at least one "tenant" (whether an individual or a single-tenant group)? Does DHS consider landlords or homeowners (like parents) to be "tenants"? Based on counsel's statements, the answer to these questions is "yes," even though that answer would conflict with the common definition of "tenant." *See Tenant*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/tenant (last visited Oct. 9, 2024) ("[*O*]*ne who has the occupation or temporary possession of lands or tenements of another . . . one who rents or leases a dwelling* (such as a house) *from a landlord*" (emphases added)); *Tenant*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=tenant (last visited Oct. 9, 2024) (defining "tenant" as "*One that pays rent to use or occupy land, a building, or other property owned by another*" (emphases added)); (Filing No. 40-1 at 2).

DHS's new definition of "tenant" raises two further questions. First, why does DHS consider an entire group to be a tenant?  The very idea that an entire group (apparently of any size)

could be a "single tenant" runs contrary to a common definition of "tenant" and the legislative intent behind § 22-12-1-4 (*see* Filing No. 40 at 12 ("[T]he legislature chose to classify structures not based on residential or commercial status but based instead on the number of tenants.")). Second, when does DHS consider a group to be a "single tenant" versus several individual "tenants"?  DHS's deposition designee explained that "single tenant" status is based on whether a group of residents begin and end their occupancy at the same time (Filing No. 32-2 at 62:8–13 ("If they chose to operate where they're opening it up to just one group, then the number of occupants wouldn't matter. As it's set up now, we believe each occupant is an individual tenant because they're coming and going on independent terms, is our position.")).  The designee was asked whether Grace House, a group recovery home operated by Inspiration Ministries, Inc., would be a Class 1 structure, even though residents of Grace House do not sign formal leases and there are no separate tenant spaces.  *Id.* at 62:14–17.  The designee stated that Grace House would still be a Class 1 structure because "the arrangement and the occupation is based on an individual's arrangement with the owner, not the group coming to the owner saying we want to occupy as one tenant. It's one person and they're getting placed with another group, already established group." *Id.* at 64:5–12.  The deposition designee's position is inconsistent with Defendants' statements in briefing and at oral argument, which define individual tenancy based on an occupant's control over other occupants, not the timing of occupancy.  Further, as Next Step noted at oral argument, Defendants always consider a nuclear family to be a single tenant, even though adult children (or other relatives) may move in and out of the family home at irregular intervals, just like Grace House residents.

DHS also leaves unresolved the question of whether (or when) foster children are individual "tenants".  In *New Horizons*, DHS stated it did not consider foster children to be

"tenants".  400 F. Supp. 3d at 767.  In its brief in this case, DHS states that the classification of a foster home "would have to be made on a case-by-case basis."  (Filing No. 40 at 17.)  According to DHS's deposition designee, a group of foster children would be a "single tenant" only if they arrive and leave the foster home together.  However, according to DHS's position at oral argument, foster homes would *always* be "single tenant" homes, since the foster parents would have control over the foster children.  Under the latter position, no case-by-case determination would be needed.

Defendants sidestep the questions about foster children by arguing that the Home's residents are not "similarly situated" to foster children because they are "adults who have full time jobs, work to support themselves, and some of whom have their own car, their own wife, their own children" (Filing No. 40 at 17–18).  This argument is misplaced.  Neither DHS nor Indiana law defines "tenant" based on employment status, vehicle ownership, or marital or family status.  The Home's residents and foster children are "similarly situated" under Indiana's zoning laws because they live in single-family homes and use those homes in the same ways.

Defendants argue that the Home "more closely resembles a hostel, dormitory, or bed-and-breakfast than [a] 'single-family' home" because "occupants come and go independently and are intended to exit the program" after a limited stay.  (Filing No. 40 at 12.)  In *New Horizons*, the Court explained why this comparison is "inaccurate":

> As Defendants point out, college students choose to live together by "virtue of what they have in common with other people, such as a limited amount of money to spend on housing." But individuals with . . . disabilities live in supported living homes because of what sets them apart from others—they are limited in one or more of their major life activities. It is not a lack of resources that necessitate homes like the one New Horizons is attempting to provide, it is the disability itself.

400 F. Supp. 3d at 751 (citations omitted) (alteration in original).  Next Step has presented evidence that the Home's residents "will share all aspects of life, as a family," including "chores, meal preparation, meals, [and] relaxation time" like a nuclear family or foster family, and unlike a hostel,

dormitory, or bed-and-breakfast (Filing No. 32-1 ¶ 9). The residents' relation to one another, ages, and lengths of stay are immaterial considerations.

Defendants also argue that "Next Step's proposed occupancy structure—more than half a dozen unrelated adults living in temporary housing for a period of 9 months to 2 years, each with an independent tenancy arrangement—would be considered Class 1 regardless of the identity of the occupants," so the classification is not based on the residents' disabilities. This assertion is flawed in two ways. First, Defendants fail to consider whether a similar occupancy structure for minors (*e.g.*, a foster home) would be classified Class 1, which is significant because neither Indiana law nor the Notice defines "tenant" based on age. And second, this assertion is contradicted by Defendants' position (discussed in detail below) that a structure with several individual tenants would remain a Class 2 structure so long as it has a single, permanent tenant (Filing No. 40 at 18).

While DHS's new definition of "tenant" does not single out people with disabilities, Defendants do not use that definition to consistently apply Indiana's zoning laws. The definition itself contains vague and undefined terms, which Defendants interpret fluidly to always classify persons with disabilities in group homes as individual "tenants," but not similarly situated persons without disabilities, without justification. That is the same type of disparate treatment prohibited in *New Horizons*.

### c.  **Comparing New Horizons**

Defendants generally contend that *New Horizons* is distinguishable because the "statutory issue" and homes are different here, so Next Step's reliance on *New Horizons* is inappropriate (Filing No. 40 at 17). With respect to the "statutory issue," Defendants argue that in *New Horizons*, they discriminated against people with disabilities by not applying Indiana zoning laws consistently, but Defendants are now applying those laws consistently, and Next Step "is asking

IDHS to apply the statute *inconsistently* in its favor." (Filing No. 40 at 17 (emphasis in original).) As explained above, DHS continues to apply Indiana's zoning laws inconsistently despite its new definition of "tenant". The "statutory issue" is therefore the same.

DHS next attempts to distinguish the Home in this case from the foster home discussed in *New Horizons*. In *New Horizons,* the Court explained that DHS's arbitrary distinction between foster children and group home residents evidenced discrimination against people with disabilities:

> Without being held to a strict definition of the word 'tenant,' DHS is able to treat foster children differently from adults with intellectual and developmental disabilities and offer no basis for the distinction other than the arbitrary declaration that New Horizons' clients are tenants, but foster children are not. The different classification for homes with three foster children and homes with three disabled adults constitutes disparate treatment.

400 F. Supp. 3d at 768.

Defendants find this analysis inapplicable for three reasons. First, Defendants contend that any determination of whether a foster home is a Class 1 or Class 2 structure would need to be made "on a case-by-case basis." (Filing No. 40 at 17.) This assertion is belied by: DHS's assertion in *New Horizons* that foster children are not "tenants"; DHS's current definition of a "single tenant," which categorically classifies foster homes as Class 2 structures because the foster parents are long-term residents who have control over the foster children; and DHS's current position that all foster homes are Class 2 structures because they only "allow 'irregular' foster care to occur in the home." (Filing No. 40 at 18). What is more, even if DHS did classify foster homes on a "case-by-case basis," DHS does not afford group recovery homes the same consideration, as evidenced by the fact that Mr. Eckstein and DHS's deposition designee classified the Next Step Home and Grace House, respectively, as Class 1 structures without knowing any specific information about the homes' residents or operations (Filing No. 33 at 11; Filing No. 32-2 at 62:14–63:4).

Second, Defendants argue that the Next Step Home residents are not "similarly situated" to foster children, but as the Court explains above, the residents are similarly situated to foster children for purposes of applying Indiana's zoning laws because they do, and intend to, use the Home the same way a foster family would.

And third, Defendants argue that the Next Step Home is distinguishable from a foster home because a foster home is not "regularly used" to house foster children.  Under § 22-12-1-5, a structure can be Class 2 "unless any part of the building or structure is *regularly used* as a Class 1 structure."  (Emphasis added.)  DHS does not define "regularly used," nor does Indiana law.[1] Nevertheless, Defendants assert that foster homes are not "regularly used" as Class 1 structures because "the primary purpose of the structure as occupied is to house a 'single tenant' [*i.e.*, the foster parents] who then intend to allow 'irregular' foster care to occur in the home." (Filing No. 40 at 18). At oral argument, counsel for Defendants clarified their position that the presence of a single, long-term tenant is the key to determining whether a structure is "regularly used" as a Class 1 structure. So a foster home with a single, long-term tenant is not "regularly used" as a Class 1 structure despite housing "irregular tenants" (*i.e.*, foster children), but the Next Step Home is "regularly used" as a Class 1 structure because it does not have a single, long-term tenant.[2]

Defendants' interpretation of "regular use" under § 22-12-1-5 is not supported by the statutory text or any other evidence. To start, § 22-12-1-5 does not refer to the "primary" use of a structure, and nothing in §§ 22-12-1-4 or -5 provides that a structure primarily used as a permanent

---

[1] At oral argument, counsel for DHS struggled to keep straight the meaning of "irregular," at one point referring to residents of the Next Step Home as "irregular" tenants and asserting that an AirBnB rented to disabled college students would be a Class 1 structure akin to an apartment because of the "irregular tenancy."

[2] At oral argument, DHS stated that the presence of a permanent resident in the Home (like a "home mother") could convert the Home to Class 2.  However, DHS did not explain why a permanent resident only *could* convert the Home to Class 2 structure but *would* convert a foster home to a Class 2 structure. And neither party discussed whether a "home mother" would be considered an "employee" under § 22-12-1-4(a)(1)(C).

residence cannot also be "regularly used" as a Class 1 structure.  If that were the law, then the classification of rental homes,[3] bed-and-breakfasts, daycares, hostels, or dormitories would turn on whether the owners of those homes happened to live there permanently, regardless of the number of tenants, and would allow the very type of overcrowded, unsafe conditions DHS seeks to prevent ([Filing No. 40 at 5](Filing No. 40 at 5) (stating that a home "converted to a daycare or dormitory" must comply with Class 1 occupancy rules)). There is no evidence that the Indiana Legislature intended to draw this type of arbitrary distinction. *Id.* at 12 ("[T]he legislature chose to classify structures not based on residential or commercial status but based instead on the number of tenants.").

The zoning statutes also do not distinguish between "regular tenants" and "irregular tenants."  They refer simply to "tenants".  And whether a tenant "regularly" or "irregularly" occupies a home is not dispositive in determining whether a home is "regularly used" as a Class 1 structure. Under § 22-12-1-4, a Class 1 structure includes structures that are "intended to be" occupied by three or more tenants, so a foster home, for example, would be used a Class 1 structure whenever the foster parents "intend" for their home to house three or more foster children, even if no foster children are currently living in the home.

Even if Defendants' interpretation of "regularly used" could find footing in the statutory text, Defendants are not applying that interpretation consistently.  Defendants explain that Next Step's operation of the Home is distinguishable from a "hypothetical foster care situation" in which "the primary purpose of the structure is to house a 'single tenant' [*i.e.*, the foster parents] who then intend to allow 'irregular' foster care in the home."  ([Filing No. 40 at 18](Filing No. 40 at 18).)  This "hypothetical situation" appears to be limited to situations in which foster children are staying in a home for relatively short periods of time. But foster children could remain in the same home for several

---

[3] These rental homes would include, for example, short-term rental homes, like AirBnBs, as well as homes rented to college students, which are regularly occupied by three or more individual, independent tenants.

months or several years, like the Next Step Home's residents.  At oral argument, defense counsel was asked whether foster children who have remained in a foster home for over two years would be "irregular tenants."  Counsel answered that this situation would be "different" because the foster parents would be "keeping [the foster children] as their own." Defendants do not elaborate on this answer, explain why long-term foster children are not "regular tenants" like the Home's residents, or, more importantly, explain why a foster home with long-term foster children would not be "regularly used" as a Class 1 structure like the Home.  The fact that Defendants cannot answer these questions but treat foster homes and group homes differently shows that Defendants are still not applying Indiana zoning laws consistently.

In *New Horizons*, the Court found that Defendants' inconsistent application of Indiana's zoning laws constituted a proxy for discrimination. DHS has since crafted a new definition of "tenant" under § 22-12-1-4 and offered new interpretations of "regularly used" under § 22-12-1-5, but because these terms are still not strictly defined, Defendants remain able to treat people with disabilities differently from similarly situated people without disabilities without any basis for that distinction. Next Step is reasonably likely to succeed on the merits of its disparate treatment claim.

### 2.   **Failure to Accommodate**

Next Step also asserts a claim for failure to accommodate under the ADA, Rehabilitation Act, and FHAA.  For purposes of the FHAA,[4] discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C.

---

[4] The ADA also has a "reasonable accommodation" requirement. 42 U.S.C. § 12131(2). "The requirements for reasonable accommodation under the ADA are the same as those under the FHAA." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002). The definition of reasonable accommodation in the Rehabilitation Act is the same as that in the ADA. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996). "All three statutory schemes embrace the concept that, in certain instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 746 (7th Cir. 2006).

§ 3604(f)(3)(B).  "The basic elements of an FHAA accommodation claim are well-settled."  *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006).  "The FHAA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling."  *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002).  The plaintiff bears the burden of showing the accommodation is reasonable on its face, at which point the defendant must demonstrate unreasonableness or undue hardship.  *Id.*

In *New Horizons*, the plaintiff claimed that DHS failed to provide a reasonable accommodation by denying a variance that would allow New Horizons to operate without a commercial sprinkler system.  Next Step's claim is broader.  Next Step contends that Defendants have failed to provide a reasonable accommodation by refusing to grant variances as to all Class 1 requirements, "including, but not limited to, requirements concerning exit width, exit signs and illumination of exits, smoke detection, and arrangement of exits," and requirements "necessitating the approval by DHS of a design release, the hiring of persons to create the plans necessary to submit the design release documents to DHS, as well as the fees attendant to this process." (Filing No. 33 at 29–30.)  Although Next Step has not requested these variances from DHS, it argues that the request would be "manifestly futile," as DHS admits that there are no variances it could grant that would allow a Class 1 structure to be treated as a Class 2 structure.  *Id.* at 30; (Filing No. 32-2 at 71:17–72:7).

Next Step contends that a variance for all Class 1 requirements is necessary to provide the Home's residents with access to housing equal to that of people without disabilities.  *Id.*  Next Step asserts that the Home's current and future residents cannot live independently or with their families in a Class 2 structure because of their disability.  *Id.* at 31.  The accommodation is necessary,

therefore, to put people with addiction disabilities on equal footing with everyone else. *Id.* Next Step also argues that its proposed accommodation would not impose any burden on DHS or require a fundamental alteration because the Home's residents will behave like a family in a typical Class 2 structure, and the Home will continue to comply with all Class 2 requirements. *Id.* at 31–32.

Defendants respond that Next Step's failure to request a variance dooms its reasonable accommodation claim, since DHS might grant those variances and alleviate any alleged harm (Filing No. 40 at 13–15). Defendants focus on the sprinkler system and offer several variances and alternatives that would allow Next Step to avoid the cost of the sprinkler system but still comply with Class 1 requirements.

Defendants contend that "Next Step has failed to show why the available alternatives are insufficient and thus has failed to prove that its 'preferred' accommodation is actually a 'necessary' accommodation." *Id.* at 17.[5] But Defendants do not address the key component of Next Step's argument—the imposition of any Class 1 requirement is discriminatory. Next Step is not merely complaining that the sprinkler system—or any other individual Class 1 requirement for which DHS *might* grant a variance—is causing hardship. Rather, the imposition of Class 1 treatment is what is causing the hardship. "[T]his case is about whether or not [Next Step's] residents should be forced to shoulder the cost of [making the Home compliant with Class 1 requirements] when they would not have to shoulder that cost if they were able to continue living with their families." *New Horizons*, 400 F. Supp. 3d at 763.

When viewing Next Step's argument through this broader lens, it is clear why its requested accommodation is "necessary" to ensure equal access to housing. Any Class 1 requirement that is not imposed on people without disabilities would impose a barrier to housing access for the Home's

---

[5] Defendants do not respond to Next Step's argument that the requested accommodation would not impose any financial or administrative burdens on the State or require a fundamental alteration.

residents.  To ensure that the residents have equal opportunity to use and enjoy housing, a variance for all Class 1 requirements is needed.  The Court's analysis in *New Horizons* is applicable here:

> New Horizons . . . is not asking DHS to waive the requirement that it install a sprinkler system because . . . installing a sprinkler system is expensive and it has limited money for housing. It asks DHS to waive the requirement of a sprinkler system because people who are capable of living on their own are not subject to that requirement, which results in *de facto* discrimination against people with intellectual and developmental disabilities.
>
> . . . . New Horizons' clients' disabilities prevent them from living in a Class 2 structure. *Id.* They therefore may not bear the lower regulatory burden those structures afford their residents.
>
> . . . . The idea that whether the State's zoning policy is discriminatory depends on the resources of the target of that policy finds no support in the statutes or caselaw. If a policy is discriminatory, it is discriminatory whether the plaintiff has a lot of money or none at all. As New Horizons points out, to accept that a discriminatory action is not discriminatory if the wronged party has enough money to overcome the discrimination would allow the government to impose all kinds of small discrimination on wealthy people of protected classes. The objective of the ADA, FHAA, and Rehabilitation Act is to stop discrimination, and the acts do not distinguish between those who can afford to face discrimination and those who cannot.

400 F. Supp. 3d at 765 (citations omitted).

The Court also agrees with Next Step that requesting a variance from all Class 1 requirements, in perpetuity, would be manifestly futile, since Defendants admit that there is no variance that would allow a Class 1 structure to be treated as a Class 2 structure.

The designated evidence supports Next Step's claim that its requested accommodation—a variance from all Class 1 requirements—is reasonable. Defendants have not shown that the accommodation is unreasonable or would present undue hardship for the State.  The Court therefore finds that Next Step has a reasonable likelihood of success on its failure to accommodate claim.

**B.** <u>**Adequate Remedy At Law, Irreparable Harm, and Balance of Harms**</u>

Having found that Next Step is reasonably likely to succeed on the merits of its claims, the Court considers whether Next Step has an adequate remedy at law, what irreparable harm Next Step will suffer if injunctive relief is denied, and the balance of harms. *Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015).

Next Step cites several courts that have held that irreparable harm presumptively flows from violations of statutes guaranteeing fair housing. *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d. 1417, 1423 (11th Cir. 1983); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); (<u>Filing No. 33 at 32</u>–33). Next Step argues that Defendants are also causing irreparable harm by preventing Next Step from fulfilling its mission, as Next Step cannot feasibly operate the Home with only two residents and cannot save funds to purchase more group recovery homes if it must pay to make the Home complaint with Class 1 requirements. (<u>Filing No. 33 at 33</u>); *see, e.g.*, *Farmworker Ass'n of Fla., Inc. v. Moody*, -- F. Supp. 3d --, No. 23-cv-22655, 2024 WL 2310150, at *18 (S.D. Fla. May 22, 2024); *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112 (N.D.N.Y. 2016); *Stewart B. McKinney Found. Inc. v. Town Plan & Zoning Comm'n of Town*, 790 F. Supp. 1197, 1208 (D. Conn. 1992). Lastly, Next Step explains that the Home's current residents are suffering irreparable harm because they cannot receive the therapeutic benefits of living in a group recovery home without more residents, and future residents are being denied the benefits of living in the Home. *See Browning*, 266 F. Supp. 3d at 901; *Step By Step*, 176 F. Supp. 3d at 134. Next Step asserts that there is no adequate remedy at law for these harms. *Id.* at 901.

In response, Defendants argue that Next Step's alleged harm is strictly monetary, and that the safety risk posed by eliminating Class 1 requirements weigh against an injunction (<u>Filing No. 40 at 18</u>–19). The Court rejected both of these arguments in *New Horizons* and rejects them again

here. Although this case practically involves the costs associated with Class 1 building requirements, "embedded therein" are harms arising from unequal opportunity and access to housing, which have no adequate remedy at law. *New Horizons*, 2017 WL 4865912, at *8. And Defendants' safety concerns are overstated:

> [Next Step] is not attempting to circumvent *all* public safety laws, only those that do not apply equally to its proposed home and the homes of other families who are not disabled. [Next Step] does not, for example, challenge the Indiana law requiring all dwellings to have at least one smoke detector because the ADA, FHAA, and Rehabilitation Act do not support such a challenge. Ind. Code § 22-11-18-3.5. Safety laws that do not result in discrimination are outside the scope those acts and remain so regardless of how the Court resolves this case.

*New Horizons*, 400 F. Supp. 3d at 764 (emphasis in original). The Home currently complies with all safety requirements for Class 2 structures, and Next Step and Behind the Wire have installed additional safety measures. Next Step merely seeks the same treatment as similar structures that house non-disabled individuals, as required by law. Next Step has also repeatedly confirmed that it intends for the Home to house only up to eight men, which is not an unreasonable number of residents for a four-bedroom home with a finished basement.

Defendants argue that Class 1 safety requirements are important in the Home because "residents do not choose who comes to live with them in the home" and "are restricted by program rules in their ability to use all parts of the structure" and "are not permitted to modify or change the structure." (Filing No. 40 at 19.) This argument is unpersuasive for several reasons. To start, Defendants do not explain what heightened risks are posed by the fact that the residents do not choose their housemates (like how foster children do not choose their foster siblings). Defendants also fail to explain how any Class 1 requirements would remedy this type of risk. Additionally, Defendants' concerns about an occupant's inability to use, modify, or change parts of the structure would apply equally—if not more so—to children. Yet DHS does not impose Class 1 safety requirements on nuclear homes, regardless of how many children live there. Defendants have not

identified any safety concerns or other harm that would weigh against injunction that permits the Home to only comply with Class 2 requirements.

Next Step's claim of denial of equal access to housing due to more stringent Class 1 requirements represents irreparable harm, and the balance of harms weighs in favor of granting Next Step's requested injunction.

**C.    Public Interest**

Next Step lastly argues that the public interest would be served by allowing Next Step to operate the Home in a way that makes it an effective place for treatment and by remedying housing discrimination against people with disabilities (Filing No. 33 at 35). Defendants respond that an injunction would disserve the public interest because it would allow Next Step "to operate outside the law and jeopardize its current and future occupants' safety" and "allow a theoretically unlimited number of tenants to reside in the structure without requiring any of the safety provisions that exist to protect the structure's tenants." (Filing No. 40 at 19.) Defendants' concerns are unfounded. Next Step does not intend to house an "unlimited number" of residents to live in the Home, nor does it intend to skirt all safety requirements. Next Step only asks that it be required to adhere to the same building requirements imposed on a similarly situated home for non-disabled people. The Court finds that the public interest would be served by granting Next Step's requested injunction.

**IV.    CONCLUSION**

For the reasons discussed above, Next Step's Motion for Preliminary Injunction (Filing No. 8) is **GRANTED**. Defendants are preliminarily enjoined from classifying the Home as a Class 1 structure and are ordered to treat it as a Class 2 structure. Because Defendants do not dispute that they will not incur monetary damages from this injunction, Next Step need not post a bond.

**SO ORDERED**.

Date:  11/5/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Bradley Davis
OFFICE OF THE INDIANA ATTORNEY GENERAL
bradley.davis@atg.in.gov

Meredith McCutcheon
OFFICE OF THE INDIANA ATTORNEY GENERAL
meredith.mccutcheon@atg.in.gov

Rebekah Durham
OFFICE OF THE INDIANA ATTORNEY GENERAL
rebekah.durham@atg.in.gov