# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NEXT STEP RECOVERY HOME, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00353-TWP-MKK |
| | ) | |
| STATE OF INDIANA, | ) | |
| EXECUTIVE DIRECTOR, INDIANA | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Next Step Recovery Home, Inc. ("Next Step" or "Plaintiff") (Filing No. 77) and Defendants the State of Indiana (the "State") and the Executive Director of the Indiana Department of Homeland Security ("DHS") (together, "Defendants") (Filing No. 79). Plaintiff alleges that Defendants have unlawfully classified its group recovery home as a Class 1 structure under Indiana's building laws and refused to grant variances from Class 1 requirements, in violation of the Fair Housing Amendments Act, 42 U.S.C. § 3604(f); the Americans with Disabilities Act, 42 U.S.C. § 12132; and the Rehabilitation Act, 29 U.S.C. § 794. For the reasons explained below, the Court **grants in part** and **denies in part** both Cross-Motions for Summary Judgment, and **grants** Plaintiff a permanent injunction.

## I.    BACKGROUND

### A.    Preliminary Issues

The Court will begin by addressing two preliminary issues raised by Plaintiff: Defendants' compliance with Local Rule 56-1; and the admissibility of Justin Guedel's Declaration.

1.  <u>**Compliance with Local Rule 56-1**</u>

Plaintiff claims that Defendants' Opening Brief[1] fails to comply with Local Rule 56-1(a) and (b), so Plaintiff's material facts should be deemed as admitted without controversy (<u>Filing No. 87 at 10</u>–11). Local Rule 56-1 provides that a movant's summary judgment brief "*must* include a section labeled 'Statement of Material Facts Not in Dispute' containing the facts: (1) that are potentially determinative of the motion; and (2) as to which the movant contends there is no genuine issue"; and that the non-movant's response "*must* include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L.R. 56-1(a)–(b) (emphases added).

Defendants' Opening Brief fails to include either a "Statement of Material Facts Not in Dispute" (as to its Cross-Motion) or "Statement of Material Facts in Dispute" (as to Plaintiff's Motion). Instead, Defendants include a "Relevant Facts" section (<u>Filing No. 81</u>). Defendants argue that the required "Material Facts" sections "do[] not make sense" for cross-motions, and that a "simpler title, 'Relevant Facts'" is appropriate (<u>Filing No. 92 at 25</u>). Defendants also argue that they complied with Local Rule 56-1(e) by supporting their "Relevant Facts" with citations to evidence, but Defendants' compliance with Rule 56-1(e) is not at issue.

Defendants are wrong to assume that they may ignore a Local Rule whenever they believe it "does not make sense." And their failure to adhere to Local Rule 56-1 has made briefing in this case more confusing, not less. The lack of a "Material Facts in Dispute" section makes it more difficult for the Court to discern which of Plaintiff's material facts, if any, are disputed by Defendants. And the inclusion of all "Relevant Facts" leaves Plaintiff to guess which facts

---

[1] The parties filed combined briefs on their cross-motions. For ease of reference, the Court refers to each party's first brief as its "Opening Brief," and each party's second brief as its "Reply."

Defendants contend are material. Defendants argue that their Reply clarifies that all "Relevant Facts" are material, but Plaintiff could not have known that when preparing its Reply, and it does not excuse Defendants' noncompliance with the Local Rules (Filing No. 92 at 25).

Fortunately, Defendants' noncompliance with Local Rule 56-1 has no effect on the Court's summary judgment analysis, since the parties dispute very few, if any, facts. The parties instead focus on the materiality of undisputed facts. To the extent Defendants' Opening Brief does not dispute Plaintiff's material facts, the Court deems those material facts as admitted without controversy. Plaintiff does not ask the Court to strike Defendants' "Relevant Facts" or ignore Defendants' evidence, so to the extent Defendants' "Relevant Facts" are not legal conclusions or argument, are supported by admissible evidence, and are not disputed by Plaintiff's Reply, the Court will consider those facts to be undisputed. All undisputed facts material to the Court's decision are included in this Order.

### 2. **Admissibility of Justin Guedel's Declaration**

Defendants designate the Declaration of Justin Guedel ("Mr. Guedel"), General Counsel for DHS (Filing No. 80-1 ¶ 2). A substantial portion of Mr. Guedel's Declaration consists of assertions about fire risks, including, for example:

> . . . . Residential structures intended to be occupied as Class 1 structures, in general, carry a higher set of risks . . . than those occupied as Class 2 structures. . . .

> The reason Class 1 structures as a general principle carry a higher set of risks . . . is that the more occupants there are in a structure who have the legal right to occupy the structure or part of it interpedently of other occupants, the less control an occupant has to implement safeguards to protect against the risk of fire and other hazards which begs for a greater state regulation. . . . .

> [G]roup living arrangements . . . present a higher fire safety risk for all occupants in the group structure. . . .

> Single family homes, including foster homes in a single dwelling unit structure . . . do not . . . pose the same risk of fire to members of the household as do group living

operations organized in the same manner as the Plaintiffs' operations—even if they contain many occupants. . . .

Multi-tenant residential group living arrangements . . . pose different building and fire safety concerns than the average single family or foster home because, in many cases, employees of the group home use and even occupy the structures. . . .

(Filing No. 80-1 ¶¶ 6–16).

Plaintiff argues that Mr. Guedel is not an expert in fire safety or fire risks, and his opinions on factors that increase or decrease fire risks are inadmissible expert opinions (Filing No. 87 at 26–27). Defendants concede that Mr. Guedel is not an expert but argue that Mr. Guedel's assertions are admissible lay testimony, as Mr. Guedel's Declaration merely "explains the defendants' reasoning underlying their enforcement of state law." (Filing No. 92 at 26–27).

Mr. Guedel may testify as to Defendants' proffered reason for applying State building laws as they do (because Defendants believe that group homes present greater fire risks than other single-family homes). However, Mr. Guedel may not testify as to whether that proffered reason is in fact true. His assertions and opinions on what factors or conditions increase fire risks or inhibit fire safety are not based on Mr. Guedel's personal knowledge, and he is not an expert on fire safety or fire risks. Those portions of Mr. Guedel's Declaration are inadmissible expert testimony, and the Court will not consider them. The Court will also not consider any legal conclusions or arguments in Mr. Guedel's Declaration, as they are not admissible evidence (Filing No. 80-1 ¶¶ 5, 14, 20–22).

**B.    Federal Antidiscrimination Statutes**

Plaintiff brings claims under the Fair Housing Amendments Act ("FHAA"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. The Fair Housing Act prohibits housing discrimination on the basis of race, color, religion, or national origin. The FHAA extends protections to persons with disabilities. The current Fair Housing Act makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer

or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. And under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Court need not conduct a separate analysis for claims brought under the FHAA, ADA, and Rehabilitation Act because "the same analysis generally applies under all three statutes." *Valencia v. City of Springfield*, 883 F.3d 959, 967 (7th Cir. 2018).

**C.**    **Indiana Building Laws**

Indiana law divides structures into two classes: Class 1 and Class 2. Class 1 is the more commercial of the two classes and includes office buildings and apartments. Class 2 structures are often residential structures, like a single-family home.

A Class 2 structure is defined as a "townhouse or a building or structure" intended to contain one or two dwelling units "unless any part of the building or structure is regularly used as a Class 1 structure." Ind. Code § 22-12-1-5. A Class 1 structure is defined as:

> (1) A building or structure that is intended to be or is occupied or otherwise used in any part by any of the following:
>
> > (A) The public.
> >
> > (B) Three (3) or more tenants.
> >
> > (C) One (1) or more persons who act as the employees of another.

Ind. Code § 22-12-1-4(a). The Indiana Code does not define "tenant" for purposes of § 22-12-1-4.

Class 1 and Class 2 structures differ not just in how they are defined, but also in how they are regulated. The structures are governed by separate sections of the Indiana Administrative Code and are subject to different requirements (Filing No. 77-1 at 12:24–14:12, 17:14–18; Filing No. 77-2 at 11:23–13:10).[2] Class 1 structures are generally subject to heightened construction standards and elevated design requirements, including sprinkler systems (Filing No. 77-2 at 14:12–17:23). Class 2 structures are not, and cannot be, required to install sprinklers. *Id.* at 17:24–18:1; Ind. Code § 22-13-2-3.5 (prohibiting state and local laws requiring sprinkler systems in Class 2 structures).

Any time a Class 1 structure is built, or alterations are made, a construction design release must be pre-approved by DHS (Filing No. 77-1 at 18:22–19:25; Filing No. 77-2 at 9:10–25). This process entails paying a fee and submitting architectural plans (Filing No. 77-1 at 21:13–22:22; Filing No. 77-3). If a Class 1 structure is built, or if construction is begun, without a pre-approved design release, then the person who engages in the construction and the person with control over the structure commit a Class C infraction. Each day of the violation is a new infraction, and the penalty for each infraction is $500.00. Ind. Code § 22-15-1-1, § 22-14-3-7, and § 34-28-5-4(c).

If a Class 2 structure is converted to a Class 1 structure through a change in use, it generally must satisfy all Class 1 requirements, including a sprinkler system (Filing No. 77-2 at 11:7–17, 21:11–14). There are two processes for potentially obtaining an exception to these requirements, though only one is available to Plaintiff because of how DHS classifies the Home. *Id.* at 22:11–23:12, 73:4–10. In the available process, design professionals will examine a structure and assign "points" for safety features. If a structure scores enough points, the sprinkler requirement (or other safety feature) may be eliminated. However, a structure might need to be modified to earn enough "points." *Id.* at 21:19–22:17, 23:13–20.

---

[2] For all citations to deposition transcripts, the Court refers to deposition page numbers and not ECF page numbers.

Class 1 structures are subject to inspection and code enforcement actions by DHS. *Id.* at 10:23–11:6. If DHS inspects a structure and finds that it fails to comply with Class 1 requirements, DHS may levy fines or seek the closure of the structure. *Id.* at 18:22; Ind. Code § 22-12-7-7.

A variance can be granted for any Class 1 or Class 2 requirements, but there is no variance to change a structure's classification (Filing No. 77-2 at 27:11–17). Variance applications, and an application fee, must be submitted to DHS. *Id.* at 33:22–34:19; Ind Code § 22-13-2-11. DHS has the exclusive right to either rule on a variance application or refer it to the Fire Prevention and Building Safety Commission ("the Commission"). 675 Ind. Admin. Code 12-5-5.3. The Commission may rule on a variance request only if DHS refers it to the Commission (Filing No. 77-2 at 29:7–32:8).

The Commission adopts state-wide building and fire safety laws that are enforced by DHS and local agencies. The Commission itself has no enforcement authority. *Id.* at 24:2–15, 26:3–7, p. 122; Filing No. 77-16 at 8:11–19); Ind. Code §§ 22-12-2-2, -2.5-3, and -2.5-4. The Commission is legally distinct from DHS, but all of its staff and facilities are provided by DHS (Filing No. 77-2 at 26:10–16); Ind. Code § 22-12-2-7. When a variance request is referred, DHS staff will prepare digital notes for the Commission, and DHS staff may make presentations to the Commission about the request (Filing No. 77-2 at 32:20–33:21).

## D. **Defendants' Application of Building Laws**

A few years ago, this Court addressed DHS's classification of group homes for persons with disabilities. In *New Horizons Rehabilitation, Inc. v. State*, 400 F. Supp. 3d 751 (S.D. Ind. 2019) ("*New Horizons*"), the plaintiff, New Horizons, operated group homes for adults with intellectual and developmental disabilities. *Id.* at 755. New Horizons had planned to build a new group home, but DHS classified the proposed home as a Class 1 structure that would need a sprinkler system. New Horizons requested a variance from the sprinkler requirement, which was

7

denied. In July 2019, the Court issued its summary judgment decision finding that Defendants' classification of the home as a Class 1 structure violated the FHAA, ADA, and Rehabilitation Act.

In *New Horizons*, DHS asserted that under Indiana Code § 22-12-1-4, New Horizons' residents would each be individual "tenants," but foster children would not. DHS did not explain the reason for this distinction. The Court held, in part, that "[w]ithout being held to a strict definition of the word 'tenant,'" DHS was able to arbitrarily treat adults with disabilities as individual tenants but not foster children, resulting in disparate treatment. *Id.* at 767–68. The Court permanently enjoined DHS from treating the group home as a Class 1 structure. *Id.* at 770.

Less than a year after the *New Horizons* decision, DHS issued a public notice (the "DHS Notice") to "clarify when supportive living facilities (facilities that provide staff to its residents to assist with daily living activities) are considered Class 1 or Class 2 Structures." (Filing No. 77-1 at p. 145). The DHS Notice includes a definition of "tenant" for purposes of § 22-12-1-4:

> A tenant is someone, or some group that either: (1) has possession of a unique portion of a structure; or (2) occupies a structure on unique or independent terms from other occupants. The overarching concern is whether the person or persons occupying, or intending to occupy, the structure or portion of the structure, are doing so independently or as a single occupant.

*Id.* The definition's key terms and phrases, including "possession," "unique portion," and "unique or independent terms," are not defined in the DHS Notice.

The next month, the State Building Commissioner (a DHS appointee) issued a written interpretation to explain when short-term rentals, specifically AirBnBs, are Class 1 or 2 structures. The purpose of this interpretation was "to avoid any one-dwelling-unit structure from being open to as many occupants or tenants as a operator desire [*sic*]." (Filing No. 77-2 at 45:7–15). The interpretation explains that an AirBnB rented out to one group under one agreement, regardless of the group's size, would have one "tenant" and be a Class 2 structure, but a home rented to three

people at three separate times would have three "tenants" and be a Class 1 structure (Filing No. 77-1 at 39:16–40:6, 146–47).

During Rule 30(b)(6) depositions, DHS elaborated on how it decides whether a group of individuals is one or multiple "tenants." DHS's designee, Mr. Guedel, at first explained that the definition "is geared towards if there's a structure that is broken up into . . . separate locations . . . where one occupant only can occupy one quadrant of the structure. . . . [I]f it was broken up that way, then you'd have as many tenants as spaces." *Id.* at 30:22–31:9. But where an occupant lives in a structure is not determinative—if several recovery home residents share a bedroom, they are still separate tenants; and if each child in a nuclear family has a separate bedroom, all of the children are still one tenant. *Id.* at 37:25–38:15, 62:21–25.

According to Mr. Guedel, DHS determines whether an occupant is a distinct "tenant" based on whether all occupants enter into one agreement to occupy a structure, or whether each occupant enters into his or her own agreement (regardless of whether the terms of each agreement are the same). The agreement can be formal or informal and involve any type of consideration, including an occupant's promise to abide by behavioral conditions. *Id.* at 58:21–59:18.

So a home rented to a "group of college kids . . . for the same duration" would be rented to one "tenant," while a home rented to students where each student has a different lease term would have as many "tenants" as students. *Id.* at 31:16–24, 37:16–24. Similarly, if a group of twenty unrelated adults rented a home through AirBnB, the number of "tenants" would depend on whether the group rented the home as one group, or as twenty individuals. In short, according to DHS, individual occupants are distinct "tenants" if they have "no control over who their other co-tenants were," and their occupancy agreements are not tied to other occupants' agreements. *Id.* at 39:16–40:6, 41:21–42:14, 64:1–10, 65:24–66:6, 82:23–83:5.

Based on the above rationale, DHS asserts that a nuclear family home could theoretically have several "tenants," assuming each member of a nuclear family enters into a separate occupancy agreement with the home's operator. And a recovery home could theoretically have only one "tenant," if all occupants enter into a single occupancy agreement. *Id.* at 49:16–50:13. However, DHS is not aware of any nuclear family home that is classified as Class 1, nor any group recovery home with more than two occupants that is classified as Class 2, other than the *New Horizons* home, which is treated as Class 2 pursuant to court order (Filing No. 77-1 at 48:20–49:7; Filing No. 77-2 at 53:25–54:15).

What about adult children, or foster children, who enter and leave a parent's home independent of their siblings? Are those children individual "tenants"? If parents were to allow their adult children to move in or out "as they please," DHS would still classify the family home as a Class 2 structure because the adult children would have no lease or tenancy agreement, have "no possessory interest of that home," and because DHS would consider them to be "guests" or "invitees" of the parents (Filing No. 77-1 at 47:20–48:19; Filing No. 77-2 at 57:2–15, 59:19:–60:5). Foster children—like recovery home residents—may enter and leave homes at different times pursuant to separate agreements (involving payment) between the State and the home's owner (Filing No. 77-2 at 60:14–25). But according to DHS, foster children are not separate "tenants" because DHS considers a "custody arrangement" to be distinct from a "tenancy arrangement," and the foster children "would just become a guest or a dependent of the tenant." *Id.* at 61:1–17, 87:21–88:8. The fact that foster parents owe legal duties to foster children is also material to DHS. *Id.* at 88:9–18.

E.    **Next Step**

1.    **The Home, the Residents, and the Program**

Next Step is a non-profit organization whose purpose is to provide therapeutic housing for men in Dubois County, Indiana, who are recovering from substance abuse and addiction disorders ([Filing No. 77-6](#) ¶ 2). To that end, Next Step used grant funds to purchase a 2,000-square foot, single-family home in Jasper, Indiana, with three bedrooms, two bathrooms, and a finished basement (the "Home"). *Id.* ¶¶ 3–4; ([Filing No. 80-6 at 43](#):13–16). The Home was previously owned and occupied by a nuclear family[3] and classified as a Class 2 structure ([Filing No. 77-6](#) ¶¶ 5–6; [Filing No. 77-1 at 81](#):20–25). The Home is located in a residential neighborhood and is indistinguishable in design, architecture, and appearance from the surrounding homes. *Id.* ¶ 7.

Next Step has made no structural changes to the Home since the purchase, although it has installed several safety features, including a security system with cameras, carbon monoxide monitors, and smoke alarms. All alarms are received by Next Step's contractor, Behind the Wire Ministries, Inc. ("Behind the Wire"), as well as an outside company. *Id.* ¶¶ 9, 36–37. The Home contains fire extinguishers, and all residents are instructed on what to do in case of a fire. *Id.*

The Home's residents (the "Residents") are all men suffering from addiction because of substance abuse disorders. Only persons with drug and/or alcohol issues may reside in the Home. *Id.* ¶¶ 10–11. Residents come to the Home from several places, including jail or prison, acute care facilities, and referrals from courts or probation departments. *Id.* ¶ 12–13. Because of their addictions and risk of relapse, Residents are not able to live on their own, cannot adequately care for themselves, and have difficulty with basic life functions like concentrating, thinking,

---

[3] During Mr. Guedel's depositions, "nuclear family" meant parents and their children ([Filing No. 77-1 at 37](#):25–38:6). This Court uses "nuclear family" in the same way in this Order.

communicating, interacting with others, parenting, and working. *Id.* ¶¶ 15–16. Residents are at a severe risk of relapse without completing programming at the Home. *Id.* ¶ 17.

Next Step entered into a contract with Behind the Wire, a nonprofit organization that provides treatment and residential care to people with histories of drug and alcohol abuse and addiction, to run the Residents' treatment program. *Id.* ¶ 18. All Residents fill out an application and undergo an interview and background check before their admission into Behind the Wire's program (Filing No. 77-7 ¶ 6).

Residents all receive and agree to extensive program requirements (Filing No. 77-7 at pp. 6–44). Residents may not leave the Home freely. *Id.* at pp. 19–20. They are permitted leaves of increasing duration throughout the program, and they are subject to substance abuse testing upon their return. *Id.* ¶¶ 16–18. They are prohibited from using drugs or alcohol and are regularly screened. *Id.* ¶ 19. Residents may smoke tobacco products only in designated outdoor areas. They may not smoke in the Home. *Id.* at pp. 13, 19, 42; (Filing No. 80-5 at 67:11–19; Filing No. 86-1 ¶ 3). Residents are also required to obtain employment as part of their programming. They receive help with finding employment, budgeting, and saving money so they can eventually achieve financial independence (Filing No. 77-7 ¶¶ 20–21).

The cost of the program is $208.00 per week. Residents sign an agreement to pay this amount as part of the program. *Id.* ¶ 22. Although Next Step has the authority to remove Residents from the Home for non-payment of the fee, it never has. *Id.* ¶ 24.

Behind the Wire's program has three phases and can take between nine months and two years, or more, to complete. *Id.* at ¶ 4. The program begins with treatment at Behind the Wire's campus in Loogootee, Indiana. *Id.* Residents are then placed in one of Behind the Wire's homes in Loogootee, or in Next Step's Home. *Id.* ¶ 8. Residents receive evidence-based and theologically-

based programming to address their substance abuse disorders, including twelve-step programming. Residents also receive relapse prevention programming and classes on parenting and socialization. The classes may be held at the Loogootee campus or the Next Step Home and are provided by Behind the Wire staff.[4] *Id.* ¶¶ 9–12. In addition to the resources provided by Behind the Wire, Residents receive remote clinical therapy through an addiction treatment center in Evansville, Indiana (Filing No. 77-7 ¶ 15).

Residents benefit from the community formed in a group living environment (Filing No. 77-6 ¶ 21). In the Home, Residents live like a family and model to each other how to care for themselves, communicate and interact with others, work, parent, and stay on task, all without drugs or alcohol. *Id.* ¶ 22. They prepare and eat many meals together (although they are permitted to use the kitchen to prepare some meals themselves), engage in activities together, hang out together, and support each other. *Id.* ¶ 24; (Filing No. 80-5 at 56:25–58:6). The Residents are primarily responsible for the care and day-to-day operations of the Home, although they are supervised by staff (Filing No. 77-6 ¶ 25).

Staff do not live in the Home but are frequently present throughout the week (Filing No. 80-6 at 17:3–6). Residents have no say in whether or when staff or other volunteers are in the Home. *Id.* at 20:10–19, 23:8–11. Staff supervise and guide Residents, provide supportive living services to assist with their use and enjoyment of the Home, and ensure that they are meeting program expectations (Filing No. 77-7 ¶¶ 12–13; Filing No. 80-6 at 17:3–18:19). There are no employee-only spaces in the Home (Filing No. 80-6 at 18:19–20).

---

[4] Next Step itself has no staff (Filing No. 80-6 at 17:13–18:6).

### 2. **DHS Inspection, Preliminary Injunction, and the Home Today**

Before Next Step purchased the Home, some of its directors met with Ryan Weininger ("Mr. Weininger"), an inspector with DHS's Code Enforcement section (Filing No. 77-6 ¶ 26). Mr. Weininger indicated that if the Home contained five or fewer persons, it would not need to be inspected by DHS. *Id.* However, shortly after Next Step purchased the Home and announced its opening, Next Step was contacted by a different DHS inspector, Seth Eckstein ("Mr. Eckstein"). *Id.* ¶ 27. Mr. Eckstein asked to inspect the Home, to which Next Step agreed. *Id.* ¶ 28.

After his inspection, Mr. Eckstein indicated that the Home would be a Class 2 structure if it contained a nuclear family or housed fewer than three Residents, but if three or more Residents moved into the Home, it would be deemed a Class 1 structure and shut down by DHS. *Id.* ¶¶ 29–30. Mr. Eckstein indicated that he thought Next Step would need to install a sprinkler system before placing more than two men in the Home.

Mr. Eckstein provided the names of three design engineers to contact. *Id.* ¶¶ 31–32. One of those engineers explained to Next Step that sprinkler systems are generally required for Class 1 structures. The engineer noted that a structure could earn "points" for safety features that might eliminate the need for a sprinkler system, but it would be costlier to make the changes necessary to earn enough "points" than to install the sprinkler system. *Id.* ¶¶ 33–34; (*see* Filing No. 77-2 at 21:19–23:20, 73:4–10). Next Step also consulted with a local fire safety company, which estimated that a sprinkler system would cost $100,000.00 (Filing No. 77-6 ¶ 35).

When the Home first opened, Next Step placed only two Residents in the Home to avoid it being classified as a Class 1 structure by DHS. Next Step soon initiated this action and sought a preliminary injunction ordering Defendants to treat the Home as a Class 2 structure (Filing No. 8). Since the preliminary injunction was granted, the number of Residents in the Home has fluctuated but never exceeded five (Filing No. 77-6 ¶ 41). The Residents live as a family. They have no

exclusive possession of any portion of the Home, although they have their own spaces within which to store their possessions.

Next Step has limited funds and wants to dedicate its money on hand toward ensuring the Home's continued operation. *Id.* ¶ 43. Next Step also aims to save as many resources as possible to eventually acquire another recovery home in Dubois County to serve its mission. *Id.* ¶ 44. If Next Step is required to pay for a sprinkler system, or to make all changes needed to earn enough "points" to avoid the sprinkler requirement, then Next Step would not have enough funds to ensure the Home's continued operation or to purchase another home in the future. *Id.* ¶ 45. Additional group recovery housing is sorely needed in Dubois County. If Next Step is unable to provide that housing, it will injure the men who would otherwise receive treatment there. *Id.* ¶ 46.

## F.    **Procedural History**

Several related actions have been filed in this Court challenging DHS's classification of group recovery homes as Class 1 structures. Four actions have proceeded to summary judgment: *Inspiration Ministries, Inc. v. State of Indiana*, No. 1:23-cv-2027; *Next Step Recovery Home, Inc. v. State of Indiana*, No. 1:24-cv-353; *Harmony Home of Huntington, Inc. v. Indiana Department of Homeland Security*, No. 1:24-cv-1228; and *Place of Grace, Inc. v. State of Indiana*, No. 1:24-cv-1272. In November 2024, the Court entered a preliminary injunction in *Next Step*, enjoining the State and DHS from classifying the plaintiff's group home as a Class 1 structure and ordering that the home be treated as a Class 2 structure. 755 F. Supp. 3d 1077, 1095 (S.D. Ind. 2024).

The parties in the four related cases conducted consolidated discovery and filed cross-motions for summary judgment with identical, consolidated briefs. The plaintiffs in *Harmony Home* and *Place of Grace* have also moved for reconsideration of the Court's dismissal of the plaintiffs' failure to accommodate claims against DHS in those cases. Defendants have not filed a

response to the motions for reconsideration, and the deadline to do so has passed. As such, all pending motions in the related cases are ripe for the Court's review.

## II.    <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation, but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties

nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III.    DISCUSSION

"A plaintiff may prove a violation of the FHA, ADA, or Rehabilitation Act by showing: (1) disparate treatment; (2) disparate impact; or (3) a refusal to make a reasonable accommodation." *Valencia*, 883 F.3d at 967. "For each respective theory, the same analysis generally applies under all three statutes." *Id.* Plaintiff alleges that Defendants violated these statutes by intentionally discriminating against its Residents, constituting disparate treatment, and by failing to grant a variance from the Class 1 sprinkler system requirement, constituting a failure to accommodate (Filing No. 78 at 44).

Defendants' Opening Brief begins with four "foundational" arguments and then argues that there was no disparate treatment because Defendants treat the Home the same as other group living arrangements, that Plaintiff's requested accommodation is not reasonable or necessary, and that specific affirmative defenses bar Plaintiff's claims. The Court will first address Defendants'

17

"foundational" arguments, then Plaintiff's claims in turn, followed by Defendants' affirmative defenses, and then Plaintiff's requested relief.

## A.    <u>Defendants' Initial Arguments</u>

At the outset of their argument, Defendants make four contentions. The first contention—that Defendants enforce fire safety laws to protect the public from fire risks—is immaterial because Plaintiff need not show an impermissible intent to prove disparate treatment or a failure to accommodate. *See Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999). The second contention—that Defendants "enforce fire safety laws indiscriminately"—is not a "foundational matter." It is instead an argument in opposition to Plaintiff's disparate treatment claim and will be considered as such. The third contention—that this case does not concern zoning rules—takes issue with the Court's use of the phrase "zoning laws," rather than "building laws," in prior orders in this and related cases (Filing No. 81 at 29). The Court recognizes that this case does not involve zoning laws, but there is nothing to suggest that the use of the phrase "zoning laws" caused any genuine confusion, so the Court will not address this contention further.

The fourth contention—that the Home is in fact a Class 1 structure under Indiana Code § 22-12-1-4—is neither "foundational" nor material. It is undisputed that Defendants classify the Home as a Class 1 structure,  and the primary issue is whether that classification is discriminatory. Whether the Home is in fact a Class 1 structure is therefore not dispositive of whether the classification is discriminatory. By way of example, if Defendants explicitly defined "tenant" under § 22-12-1-4 as "a person recovering from a substance abuse disorder," then the Home would in fact be a Class 1 structure. Whether the resulting classification is discriminatory is a separate question. To be sure, in *New Horizons*, the plaintiff did not argue, and the Court did not hold, that the group homes were not Class 1 structures; the Court held that Defendants' classification of the group homes (right or wrong) was discriminatory. *New Horizons*, 400 F. Supp. 3d at 768.

Defendants' new proffered reasons for classifying the Home as a Class 1 structure may be relevant in determining whether Defendants' classification of the Home is justified. The Court will therefore address those new reasons in its analysis of Plaintiff's disparate treatment claims.

**B.      Disparate Treatment**

Disparate treatment under the FHAA, ADA, and Rehabilitation Act "involves a showing of intentional discrimination, provable via either direct or circumstantial evidence." *Nikolich v. Vill. of Arlington Heights*, 870 F. Supp. 2d 556, 562 (N.D. Ill. 2012); *see Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995) (Rehabilitation Act); *Kormoczy v. Sec'y., U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823 (7th Cir. 1995) (Fair Housing Act); *Smith v. Hous. Auth. of S. Bend*, 867 F. Supp. 2d 1004, 1016 (N.D. Ind. 2012) (ADA). A plaintiff "need not prove an impermissible intent." *Washington*, 181 F.3d at 846; *see Alexander v. Choate*, 469 U.S. 287, 296 (1985) (explaining that the Rehabilitation Act prevents discrimination resulting not only from "invidious animus," but also from "thoughtlessness," "indifference," or "benign neglect"). A technically neutral classification cannot be used "as a proxy to evade the prohibition of intentional discrimination." *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992); *see New Horizons*, 400 F. Supp. 3d at 768.

Plaintiff argues that Defendants are continuing to use Indiana's facially neutral building laws as a proxy for discrimination, as shown by Defendants' treatment of the Home compared to similarly-situated foster homes and nuclear family homes[5] without justification. Defendants respond that other group living arrangements, not foster or nuclear homes, are the proper comparators, and because Defendants treat the Home the same as other group living arrangements, there is no evidence of discrimination.

---

[5] Defendants argue that Plaintiff has an "unbounded" definition of "family," so any comparison to a "family" is unhelpful (Filing No. 81 at 47–50). But Plaintiff does not compare the Home to any and all "family" homes. Plaintiff compares the Home to only foster homes and nuclear family homes (meaning parents and their children), and Defendants know that (*see* Filing No. 81 at 38–46). Plaintiff's general definition of a "family" is immaterial.

### 1. **Similarly-Situated Comparator**

"[T]he similarly-situated inquiry is flexible, common-sense, and factual." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Comparators "must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Id.* at 846 (citation modified). "There must be 'enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Id.* at 847 (quoting *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007); *see Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 553 U.S. 442 (2008) ("[E]ssentially, are there enough common features between the individuals to allow a meaningful comparison?"); *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (identifying the issue as whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment"). As long as the distinctions between the Plaintiff and its proposed comparators are "not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied." *Id.* at 846–47 (describing the similarly-situated standard as "flexible" with no "magic formula," and cautioning that the inquiry "should not devolve into a mechanical, 'one-to-one mapping between employees'"). "Whether a comparator is similarly situated is 'usually a question for the fact-finder,'" and dismissal of a disparate treatment claim on summary judgment is appropriate "only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman*, 667 F.3d at 846–47 (quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

This Court has twice before found that foster homes are proper comparators for group homes for disabled persons like the Plaintiff's Home. In *New Horizons*, the Court held that "[t]he different classification for homes with three foster children and homes with three disabled adults constitutes disparate treatment." 400 F. Supp. 3d at 768. And in *Next Step*, the Court even more

plainly found that "[t]he Home's residents and foster children are 'similarly situated' under Indiana's [building] laws because they live in single-family homes and use those homes in the same ways." 755 F. Supp. 3d at 1088. The Court reaches the same conclusion here.

There are ample, material similarities between the Homs and foster homes or nuclear family homes. DHS explains that Indiana's building laws are intended to "regulate[] different occupancy types" and "are set up just to apply certain safety provisions based on how the structure is being occupied," so how Residents occupy the Home is material (Filing No. 77-1 at 25:1–6). Like a foster family or nuclear family, the Residents spend quality time together, eat meals together, and share common areas. Like children in a foster or nuclear family, the Residents do not have exclusive possession of any area of the Home. They share bedrooms, and they cannot control when staff or co-occupants (like parents or siblings) enter their rooms. Residents are also not allowed in certain rooms in the Home, just as parents may bar their children from the parents' bedroom, a home office, a basement, or even a cabinet containing medicines or cleaning supplies. Residents have chores and must follow house rules. They need permission to leave the Home and can have those privileges revoked if they do not behave, like being grounded. Residents are also similarly situated to foster children in the reason they live together—because they cannot live independently. *See Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) ("Often, a community-based residential facility provides the only means by which disabled persons can live in a residential neighborhood, either because they need more supportive services, for financial reasons, or both."). These unmistakable similarities are all material, as they relate to how Residents use and occupy the Home.

Defendants assert that the Home is materially distinguishable from foster homes and nuclear family homes in two ways: the legal duties owed to occupants; and the "manner and use"

of the homes (Filing No. 81 at 39–46). The Court will address how each factor does not distinguish the Home from the comparator homes and, in any event, why these distinctions are not material.

First, Defendants identify several legal duties owed by foster parents to foster children, and by parents in a nuclear family to their minor children, which Plaintiff does not owe to Residents (Filing No. 81 at 39–43). As Plaintiff notes, though, this difference does not distinguish the Home from nuclear family homes with adult children (Filing No. 87 at 26; *see* Filing No. 81 at 41 ("Obviously, [when] residents are adults, . . . the children and foster laws cited above do not apply . . . .")). To the extent these legal duties distinguish the Home from foster homes and nuclear family homes with minor children, the distinction is not material. Defendants tie this distinction to fire risks, arguing that "[t]he higher duties and harsher penalties parents face mean that parents in single-family homes have greater incentive to ensure the members of the family are safe from fire than do the Plaintiffs who do not face similar liability for any negligence that results in fire." *Id.* at 43. However, Defendants' position that legal duties to minors are what incentivize homeowners to prevent fire hazards is purely argumentative, and the similarly-situated analysis is based in fact. *Coleman*, 667 F.3d at 841. There is no evidence that the Home poses greater fire risks than foster homes or nuclear family homes. What is more, the undisputed fact that Plaintiff has voluntarily installed and imposed several fire safety measures that are not required in foster homes or nuclear family homes strongly cuts against Defendants' argument.

Defendants imply that the absence of certain legal duties is why Plaintiff "tolerates" Residents smoking and grilling in designated outdoor areas and cooking meals on their own. But these fire risks are not unique to the Home. Many parents smoke in or outside their homes, and they often allow older children to grill and cook on their own. In sum, the difference in legal duties

owed to minor children compared to Residents is not material and does not allow for "a meaningful comparison" between Plaintiff's Home and foster homes or nuclear family homes. *Id.* at 847.

Second, Defendants cite ways in which the Residents' "manner and use" of the Home differs from the use of a foster home or nuclear family home. Defendants first note that Residents do not move in and out of the Home together, and that each Resident enters the Home "on independent and separate bases from each other" (*i.e.*, pursuant to individual agreements with Plaintiff, rather than one agreement for all Residents). These factors distinguish the Residents from a nuclear family with minor children, but not from a nuclear family with adult children or a foster family, where children enter and leave the homes at separate times, independently of their siblings. This factor is also immaterial because the Residents' staggered occupancy does not affect how they occupy the Home once they are living there.

Defendants next point to the Home's "conditions of occupancy." (Filing No. 81 at 44). According to Defendants, the fact that Residents must comply with Plaintiff's program requirements to remain in the Home distinguishes them from a nuclear or foster family. But a child's occupancy in both a foster home and a nuclear home can be, and often is, conditional. A child's occupancy in a foster home is conditioned on payments by the State. Defendants argue that the Residents' payments are "rent" under Indiana landlord-tenant laws, and foster payments are not, but even assuming that the program fees are "rent"—which the Court does not now decide— Defendants fail to explain how this distinction is material. The Court finds that it is not material. Both payments serve the same purpose—the benefit of the homes' occupants—and the payments' different legal classifications do not affect how the occupants use the homes. *See Coleman*, 667 F.3d at 841 ("[T]he similarly-situated inquiry is . . . factual.").

As to nuclear families, Defendants do not dispute that parents could condition their adult child's occupancy in the family home on doing chores, keeping a job, or paying rent, among other conditions.[6] Yet Defendants do not consider adult children to be individual "tenants" because they "consider adult children living in a family home to be the invitees, the guests, of the parents." (Filing No. 81 at 45). Defendants do not explain why adult children, but not Residents, would be "invitees" and thus not individual "tenants." The designated evidence shows that Residents have no greater "possessory interest" in the Home than adult children do in their parents' homes—neither group owns or has an exclusive right to use any portion of the homes, and both groups may use the homes only as permitted by the parents/Plaintiff, subject to the parents'/Plaintiff's conditions. Defendants' position that adult children are not "tenants" because they are "invitees" is conclusory and misguided. Just like Defendants' position on foster children in *New Horizons*, their position on adult children "essentially admit[s] what [Plaintiff] alleges"—that DHS treats . . . disabled persons differently from others without any justification. 400 F. Supp. 3d at 767–68.

In a footnote, Defendants assert that if a nuclear family were to "organize[] itself such that more than two adult children take possession of a portion of the family home as unique tenants," then Defendants would classify the nuclear family home as a Class 1 structure. This assurance rings hollow for several reasons. First, it is circular; Defendants state that they would consider adult children to be unique tenants only if they entered the home "as unique tenants." *Id.* Second, it conflicts with Defendants' position that adult children, as "invitees" of their parents, never "take possession" of the family home. Third, DHS admits that it is not aware of any such nuclear family

---

[6] Denny Ceizyk, *Two-Thirds of Millennials and Gen Zers Who Moved Back Home During the Pandemic Still Live There*, LendingTree (August 30, 2022) ("Only 1 in 10 parents wouldn't set any rules for adult children living at home. Most parents would add financial strings to an adult-at-home occupancy," including rent, steady employment, and assistance with chores and household expenses), https://www.lendingtree.com/home/mortgage/living-with-parents-survey/#:~:text=58%25%20that%20expect%20their%20kids,adult%20child%20strained%20their%20relationship.; *see also* Amanda Jackson, *A judge sides with parents and rules their 30-year-old son must move out*, CNN (May 23, 2018, at 5:44 PM ET), https://www.cnn.com/2018/05/22/us/judge-rules-son-must-move-out-new-york-trnd

home. (Filing No. 77-1 at 48:20–49:7; Filing No. 77-2 at 53:25–54:15); *cf. Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (finding disparate treatment even though "[i]t would be difficult, if not impossible, to find other individuals whose situation is similar"). And fourth, Defendants' classification of the Home is not lawful simply because Defendants are willing to "overdiscriminate" against certain similarly situated nuclear families. *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159–60 (9th Cir. 2013), *cert. denied*, 574 U.S. 974 (2014) (stating that a defendant cannot immunize itself from discrimination claims by identifying a comparator not in the protected group).

The Court also addresses Defendants' proffered comparators—group living facilities for unrelated individuals, including fraternity houses, bed and breakfasts, homeless shelters, residential group homes for youth, maternity homes for at-risk mothers, and group homes for the developmentally disabled[7]—which DHS treats as Class 1 structures (Filing No. 81 at 52). As an initial matter, the Court notes that even if these group living facilities were *also* proper comparators, DHS's treatment of them as Class 1 structures is not dispositive. The United States Supreme Court has repeatedly held that discriminatory laws are not lawful simply because they happen to apply to groups outside the protected class at issue.

> The principle that overdiscrimination is prohibited undergirds all of constitutional and statutory anti-discrimination law, although it often goes unsaid precisely because it is so foundational. Discriminatory laws, policies, or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group. This does not, however, change the fact that such laws, policies, or actions are discriminatory when they are undertaken for the purpose of harming protected individuals.

---

[7] It is unclear why Defendants try to analogize their treatment of Plaintiff's recovery Home to "group homes for the developmentally disabled," seeing as *New Horizons* held that Defendants' treatment of a group home for the developmentally disabled was discriminatory. 400 F. Supp. 3d at 769.

*Pacific Shores Props.*, 730 F.3d at 1160 (citing cases); *see Hunter v. Underwood*, 471 U.S. 222, 222 (1985) ("That [the statute] may have been adopted to discriminate against poor whites as well as against blacks would not render nugatory the purpose to discriminate against blacks . . . ."); *McWright*, 982 F.2d at 228 (reversing dismissal of disability discrimination claims at pleadings stage; "Even if the DOE's apparent policy disadvantages *all* adoptive mothers (including reproductively normal ones), the 'fit' may be sufficient, for the underlying attitude might still be a negative one aimed at those incapable of bearing children."); *cf. Adbu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (rejecting "the grotesque scenario where an employer can effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated employees are victimized").

With that background in mind, the Court discusses whether other group living homes are comparable to Plaintiff's Home. Defendants cite two cases in which courts found that group living homes and addiction recovery homes are similarly situated: *Courage to Change Ranches Holding Co. v. El Paso County*, 73 F.4th 1175 (10th Cir. 2023); and *Ohio House, LLC v. City of Costa Mesa*, 135 F.4th 645 (9th Cir. 2025). However, neither case adopted Defendants' position, which is that group living homes for unrelated persons are the *only* or *best* comparator for recovery homes. To the contrary, in *Courage to Change*, foster family homes were one of the comparators. 73 F.4th at 1181, 1195. *Courage to Change* and *Ohio House* also challenged statutory language that is substantially different than the Indiana building laws being challenged here.

Defendants also cite a statement from the United States Department of Justice and Department of Housing and Urban Development, which explains that a law that treats a group of unrelated persons without disabilities better than a similar group of persons with disabilities violates the Fair Housing Act (Filing No. 81 at 51). This example likewise does not limit proper

comparators to group living homes for unrelated persons. To the contrary, in at least one federal lawsuit, the Department of Justice argued that group recovery homes may be similarly situated to nuclear families for purposes of showing discrimination. *See* Statement of Interest of the United States of America at 14, *Lawrence Cnty. Recovery, LLC v. Vill. of Coal Grove, Ohio*, No. 1:24-cv-452 (S.D. Ohio. Dec. 6, 2014), Dkt. 13.

Defendants argue that residents of other group living arrangements are similarly situated to the Residents because "they are unrelated," are owed "lesser legal duties" than children in a foster or nuclear family, and because they all enter and leave their homes independent of their co-occupants (Filing No. 81 at 52).[8] For the reasons explained above, these factors are not material to the similarly-situated analysis. Defendants next argue that group living arrangements and the Home are comparable because all of the structures are classified as "Residential Group R" structures under the Indiana Building Code. *Id.* at 52. Defendants' application of building laws to the Home, in a lawsuit alleging that Defendants' application of building laws discriminates against the Home, does not convince the Court that group living arrangements are proper comparators. *See Courage to Change*, 73 F.4th at 1195 (rejecting argument that a state statute justified discrepancies in defendant-county's code provision).

In addition to concluding that Defendants have failed to identify material similarities between the Home and other group living arrangements, the Court reiterates that these types of groups are dissimilar in several notable ways. Some groups, like fraternity members, "choose to

---

[8] Defendants do not offer any other information about their proffered comparators—like the ages of the homes' occupants, fee arrangements, conditions for occupancy, or occupants' specific possessory interest in the structure (or any parts of it)—despite arguing that this information as material when comparing the Home to foster homes or nuclear family homes. Without more information, some of these comparators "only raise more questions" about how DHS applies Indiana's building laws. 755 F. Supp. 3d at 1078. In a fraternity, for example, the group typically chooses its members, and the members enter and leave the fraternity house as one group at the beginning and end of each school year. This situation squarely fits DHS's description of a single "tenant," yet Defendants seems to categorically classify fraternities as Class 1 structures.

live together by virtue of what they have in common with other people." *New Horizons*, 400 F. Supp. 3d at 766. Bed-and-breakfast patrons are even more dissimilar because the bed-and-breakfast is not their primary residence, and they choose to stay there for leisure. These group living arrangements do not entail "family" activities and responsibilities, like chores, group meal preparation, group meals, and relaxation time. *Next Step*, 755 F. Supp. 3d at 1088. Defendants correctly note that *some* group living arrangements offer *some* of these communal activities, but none of them encourage *all* of them. Another important distinction is that in a bed-and-breakfast or transitional house for the homeless, occupants often pay to have exclusive possession of a portion of the structure. Residents do not have the same interest in any part of the Home.

Based on the undisputed facts, relevant law, and analogous caselaw, the Court finds that the relevant comparators for the Plaintiff's Home are nuclear family homes and foster homes. Defendants do not dispute that they treat the Home differently than nuclear family homes or foster homes, so Plaintiff has established a *prima facie* case of intentional discrimination.

## 2. **Justification and Pretext**

Defendants' primary justification for classifying the Home, but not foster or nuclear family homes, as Class 1 structures is fire safety. The Court recognizes the importance of protecting the public from fires, but Defendants' concerns about increased fire risks at the Home are unfounded. There is simply no evidence supporting Defendants' assertion that fire risks are increased whenever an occupant enters a home independently of other occupants, regardless of whether all occupants must abide by the same rules while in the home and regardless of the fire safety measures actually in the home. Even a "common sense understanding . . . that the more occupants are in a structure, the greater the risk of fire becomes" does not justify Defendants' conduct. DHS admits that it does not apply or enforce fire safety laws based on the number of occupants in a structure (*see, e.g.*,

Filing No. 77-1 at 62:8–12 ("If they chose to operate where they're opening it up to just one group, then the number of occupants wouldn't matter.")).

Aside from a lack of justification, DHS's flexible yet targeted definition of "tenant" suggests discrimination. In *New Horizons*, the Court found that DHS was able to discriminate against a group home for adults with disabilities because it was not held to a "strict definition" of "tenant" under § 22-12-1-4. Less than a year later, DHS created a definition of "tenant," but not a strict one. The definition is comprised of undefined terms and phrases, the meaning and application of which has changed over time. At the preliminary injunction stage in *Next Step*, for example, Defendants claimed that a foster home's classification would be a case-by-case determination, but a foster home would likely be a Class 2 structure because the home would have a "primary" or "nuclear" tenant (the foster parents), and the foster children's presence would not be "regular" enough to convert the structure to Class 1. (Filing No. 77-1 at 44:11–45:2); *Next Step*, 755 F. Supp. 3d at 1089–90 (S.D. Ind. 2024). Defense counsel assured the Court that a single, long-term tenant was "the key" to determining whether occupants are one or separate tenants. However, Defendants have since abandoned this rationale.

Defendants' interpretation of its definition is now more refined: an occupant is an individual "tenant" if he or she enters into a formal or informal agreement with the home's owner/operator, independent of other occupants. Not coincidentally, this is the only way in which residential group recovery homes can operate. *See McWright*, 982 F.2d at 228; *Pacific Shores Props.*, 730 F.3d at 1160 n.23 ("In a case of proxy discrimination the defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group."). So in residential neighborhoods, DHS's definition of "tenant" always applies to group homes for persons with disabilities. DHS's definition also ensures that other common types of group homes

in residential neighborhoods—nuclear family homes, foster family homes, college rentals, and AirBnBs—do not have more than one "tenant" except in rare, hypothetical cases. Additional assumptions by Defendants—that adult children are "invitees" of their parents, and foster homes are "custody arrangements" instead of "tenancies"—ensures that only group homes for disabled persons have their presence in residential neighborhoods conditioned on Class 1 requirements.

In sum, despite adopting a facially neutral definition of tenant, "Defendants remain able to treat people with disabilities differently from similarly situated people without disabilities without any basis for that distinction." *Next Step*, 755 F. Supp. 3d at 1091. Just as in *New Horizons*, Indiana's building laws are being used as a proxy for discrimination.

Defendants offer two new neutral reasons for classifying the Home as a Class 1 structure: the Residents are each a "tenant" as that term is defined in the dictionary[9] and under Indiana's landlord-tenant laws (Title 32 of the Indiana Code); and the Home is occupied or used by "the employees of another" under Indiana Code § 22-12-1-4(a)(1)(C). However, it is undisputed that Defendants did not adopt, and do not use, either of those definitions for purposes of § 22-12-1-4. (Filing No. 81 at 31 ("[B]ecause it is not defined in the Administrative Code, the word 'tenant' could have a more expansive definition for purposes of the Class 1 versus Class 2 distinction than what the landlord-tenant statutes, or the dictionaries allow.")). Nor did Defendants classify the Home as a Class 1 structure based on the presence of employees under § 22-12-1-4(a)(1)(C). In fact, at the time DHS classified the Home, it had not "formed an opinion whether . . . (a)(1)(c) is applicable with employees and any services that they're providing." Even after this lawsuit was

---

[9] Defendants note that in *Next Step*, the Court "guided the parties to the common dictionary definition of 'tenant.'" (Filing No. 81 at 30). However, the Court merely cited the dictionary definition of "tenant" to demonstrate how much Defendants' definition of "tenant" conflicted with the term's "common definition." 755 F. Supp. 3d at 1087.

filed, DHS continued to treat the Home as a Class 2 structure with respect to subsection (a)(1)(c) ([Filing No. 77-1 at 27](#):8–28:6, 60:4–61:16; [Filing No. 77-2 at 40](#):18–24).

The Home's classification was based solely on the number of "tenants." ([Filing No. 77-1 at 27](#):8–28:6, 59:16–24, 75:25–76:17, 78:3–7; [Filing No. 77-2 at 54](#):21–55:18 ("The number of tenants is what is making it Class 1 and how the operator is offering tenancy to the structure.")). Defendants' new proffered reasons are therefore pretextual. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir. 1996) ("When a plausible reason was in fact not the reason, it is pretextual."); *see O'Neal v. City of New Albany*, 293 F. 3d 998, 1005–06 (7th Cir. 2002). The Court therefore need not, and does not, address whether either argument has merit.

Based on the undisputed material facts, even when construed in favor of Defendants, no reasonable jury could find that Defendants are applying Indiana's building laws indiscriminately. Defendants' definition of "tenant" is designed and interpreted to impose Class 1 building requirements on the Home, but not similarly situated single-family residences, and there is no justification for this different treatment. Defendants have engaged in intentional discrimination, and Plaintiff is entitled to summary judgment on its disparate treatment claims.

## C.    <u>Failure to Accommodate</u>

Plaintiff also asserts failure to accommodate claims. Failure to accommodate is one way in which Plaintiff can prove a violation of the FHAA, ADA, and Rehabilitation. *See Valencia*, 883 F.3d 976. Plaintiff has already established violations of these statutes by showing disparate treatment, and on that basis, Plaintiff is entitled to an injunction relieving the Home from Class 1 building requirements that are not imposed on Class 2 structures. The Court therefore need not, and does not, reach Plaintiff's failure to accommodate claims or related requests for equitable relief ([Filing No. 78 at 49](#), 56 (stating that if the Court finds intentional discrimination, "there is no need

to go further"; seeking equitable relief as to failure to accommodate only "as necessary")). Plaintiff's failure to accommodate claims can be **dismissed without prejudice**.

### D.    <u>Defendants' Affirmative Defenses</u>

Defendants contend that the State must be dismissed from this action because it has sovereign immunity as to Plaintiff's ADA and FHAA claims and because the State is not a proper party to Plaintiff's Rehabilitation Act claim (<u>Filing No. 81 at 76</u>). In their Reply, Plaintiff does not oppose dismissal of the State, as complete relief may be awarded against DHS (<u>Filing No. 87 at 55</u>). The Court therefore **grants** Defendants' Cross-Motion for Summary Judgment as to Plaintiff's claims against the State of Indiana.

### E.    <u>Requested Relief</u>

Having prevailed on its disparate treatment claims under the FHAA, ADA, and Rehabilitation Act, Plaintiff need only satisfy the other elements required for a permanent injunction: irreparable injury for which there is no adequate remedy at law, the balance of harms tips in favor of Plaintiff, and the public interest would not be disserved by granting the injunction. *Indiana Protection and Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Correction*, 2012 WL 6738517, at *24 (S.D. Ind. Dec. 31, 2012). Plaintiff meets each of these elements.

The Court has previously explained that although this case "practically involves the costs associated with Class 1 building requirements, 'embedded therein' are harms arising from unequal opportunity and access to housing, which have no adequate remedy at law." *Next Step*, 755 F. Supp. 3d at 1094 (quoting *New Horizons*, No. 17-cv-49, 2017 WL 4865912, at *8 (S.D. Ind. Oct. 27, 2017)). Several courts have held that irreparable harm presumptively flows from violations of statutes guaranteeing fair housing. *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d. 1417, 1423 (11th Cir. 1983); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001). Absent an injunction, Plaintiffs would also face fines and the potential closure of

its Home, thwarting Plaintiff's mission and depriving Residents of housing and services. These harms are irreparable with no adequate remedy at law. *See, e.g.*, *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 134 (N.D.N.Y. 2016); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1208 (D. Conn. 1992).

The balance of harms also favors a permanent injunction because an injunction would only relieve the Home of Class 1 building requirements that are not imposed on Class 2 structures (Filing No. 78 at 54). As in *New Horizons*, Plaintiff "is not attempting to circumvent *all* public safety laws, only those that do not apply equally to its proposed home and the homes of other families who are not disabled." *New Horizons*, 400 F. Supp. 3d at 764 (emphasis in original). Defendants insist that the Home poses heightened fire risks, but, again, there is no evidence substantiating this fear, and the "fire risky" behaviors that worry Defendants—cooking in the kitchen and smoking outside—are typical activities for any residential home. The undisputed evidence shows that the Home actually exceeds fire safety standards for Class 2 structures through the use of fire extinguishers, fire drills, and prohibitions on smoking indoors. The number of Residents in the Home also does not tip the balance of harms in Defendants' favor. The Home does not house an unreasonable number of Residents considering the Home's size and layout. Defendants have not identified any safety concerns or other harm that would weigh against an injunction that permits the Home to only comply with Class 2 requirements. The balance of harms weighs in favor of a permanent injunction.

Plaintiff lastly argues that the public interest would be served by requiring Defendants to comply with federal fair housing laws (Filing No. 78 at 55). The Court agrees. The public's interest in eliminating discriminatory housing practices outweighs its interest in imposing stricter building requirements on the Home. The Court appreciates the seriousness of fire risks and the importance

of fire safety laws in protecting the public from fires. However, there is no evidence that the Home poses a greater fire risk than other similarly situated Class 2 structures, so the public's interest in preventing and mitigating house fires would not be served by imposing additional building requirements on the Home. *See Next Step*, 755 F. Supp. 3d at 1095 ("[Plaintiff] only asks that it be required to adhere to the same building requirements imposed on a similarly situated home for non-disabled people."). The public interest would be served by Plaintiff's requested injunction.

Accordingly, the Court **grants** Plaintiff's request for a permanent injunction requiring DHS to treat the Home as a Class 2 structure.

## IV.    CONCLUSION

For the reasons explained above, the Court **GRANTS in part and DENIES in part** Plaintiff's Motion for Summary Judgment (Filing No. 77) and **GRANTS in part and DENIES in part** Defendants' Cross-Motion for Summary Judgment (Filing No. 79). Summary judgment is **granted** in favor of Plaintiff, and **denied** in favor of Defendants, on Plaintiff's disparate treatment claims against DHS. Summary judgment is **granted** in favor of the State of Indiana, and **denied** in favor of Plaintiff, on Plaintiff's claims against the State. Plaintiff's failure to accommodate claims against both Defendants and Plaintiff's disparate treatment claims against the State are **dismissed without prejudice**.

The Court **DECLARES** that DHS engaged in intentional discrimination in violation of the FHAA, ADA, and Rehabilitation Act by deeming the Home to be a Class 1 structure and **ENTERS A PERMANENT INJUNCTION enjoining** DHS from treating Plaintiff's Home as a Class 1 structure and **ordering** DHS to treat the Home as a Class 2 structure.

The trial dates are **VACATED**, and final judgment  and a Rule 65(d) permanent injunction will issue under separate order.

**SO ORDERED**.

34

Date:   3/10/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Alexander Robert Carlisle
OFFICE OF THE ATTORNEY GENERAL
Alexander.Carlisle@atg.in.gov

Bradley Davis
Office of IN Attorney General
bradley.davis@atg.in.gov

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org